



Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

FLUOR AUSTRALIA PTY.
LTD., an Australian
corporation,

          Plaintiff,

    v.

ALLIANZ GLOBAL RISKS US
INSURANCE COMPANY, etc.,
et al.,

          Defendants.

Case No. SACV 04-1326-
VAP(SGLx)

**[Motion filed on July 1,
2005.]**

**ORDER GRANTING IN PART
CROSS-PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

Cross-Plaintiffs' Motion for Summary Judgment came
before the Court for hearing on August 8, 2005.  After
reviewing and considering all papers filed in support of,
and in opposition to, the Motion, as well as the
arguments advanced by counsel at the hearing, the Court
GRANTS IN PART the Motion.

## I.  BACKGROUND

Fluor Australia Pty. Ltd. ("Fluor") filed a Complaint
for Interpleader and Declaratory Relief on November 15,

DOCKETED ON CM

AUG 17 2005

BY

2004, against Allianz Global Risks US Insurance Company ("Allianz"), Certain Lloyd's Underwriters ("Lloyd's"), SR International Business Insurance Co. Ltd. ("SRI"), and Kemper Environmental, Ltd. ("Kemper").  Fluor seeks resolution of multiple and conflicting liabilities regarding funds recovered in ongoing subrogation actions in Australia.

On July 1, 2005, Cross-Plaintiffs Lloyd's, SRI, and Kemper (collectively "the Fifth-Layer Insurers") filed a Motion for Summary Judgment ("Mot.") and lodged a proposed Separate Statement of Uncontroverted Facts ("St. of Facts").  On July 20, 2005, Cross-Defendant Allianz filed an Opposition ("Opp'n") and a Statement of Genuine Issues ("St. of Issues").  The Fifth-Layer Insurers filed a Reply on August 1, 2005.

## II.   LEGAL STANDARD

A motion for summary judgment shall be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Fed. R. Civ. P. 56(c).  The moving party must show that "under the governing law, there can be but one reasonable conclusion as to the verdict."  Anderson, 477 U.S. at 250.

///

1   Generally, the burden is on the moving party to
2   demonstrate that it is entitled to summary judgment.
3   Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998);
4   Retail Clerks Union Local 648 v. Hub Pharmacy, Inc., 707
5   F.2d 1030, 1033 (9th Cir. 1983).  The moving party bears
6   the initial burden of identifying the elements of the
7   claim or defense and evidence that it believes
8   demonstrates the absence of an issue of material fact.
9   Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
10
11   In addition, where the moving party has the burden at
12   trial, "that party must support its motion with credible
13   evidence . . . that would entitle it to a directed
14   verdict if not controverted at trial."  Celotex, 477 U.S.
15   at 331.  The burden then shifts to the non-moving party
16   "and requires that party . . . to produce evidentiary
17   materials that demonstrate the existence of a 'genuine
18   issue' for trial . . . ."  Id.; Anderson, 477 U.S. at
19   256; Fed. R. Civ. P. 56(e).  In an interpleader action,
20   at trial the burden of proof is on every claimant to
21   "prove their right to the fund by a preponderance of the
22   evidence."  Rhoades v. Casey, 196 F.3d 592, 600 (5th Cir.
23   1999).
24
25   **III.   UNCONTROVERTED FACTS**
26   The Court adopts as uncontroverted the stipulated
27   facts submitted by the Fifth-Layer Insurers and Allianz.
28

1 [Stipulated Facts filed on June 30, 2005 ("Stipulated
2 Facts"); see also St. of Facts; St. of Issues.[1]]  These
3 facts, which are summarized below,[2] are "admitted to
4 exist without controversy" for the purposes of this
5 Motion.  See L.R. 56-3.

6

7     Fluor, a Delaware corporation, was insured by several
8 layers of professional liability insurance under a
9 combined aggregate protection insurance program ("CAP
10 Insurance Program") during the period from November 1,
11 1998, to November 1, 2000.  [St. of Facts No. 1.]  The
12 layers of insurance coverage afforded Fluor under the CAP
13 Insurance Program are illustrated as follows:

| Layer | Insurer | Limits of Liability |
|---|---|---|
|  | Self-insured Retention | $10 million |
| First Layer | CNA | $15 million in excess of $10 million |
| Second Layer | American International Specialty Lines Insurance Co. | $75 million in excess of $25 million |

---

[1] The parties agree that no material facts relevant
to the Motion are in dispute.  [See St. of Issues at 2.]
Nevertheless, Allianz argues that proposed Uncontroverted
Fact Numbers 26 and 27 are irrelevant.  [Id. at 3.]  The
Court agrees that these two proposed facts are not
material to the resolution of the Motion and therefore
declines to adopt them.

[2] Some of the stipulated facts are also incorporated
into the discussion below.

| Third Layer | (1) Lloyd's<br>(2) Gerling Konzern<br>(3) Columbia Casualty | $100 million in excess of $100 million |
| Fourth Layer | Allianz | $50 million in excess of $200 million |
| Fifth Layer | (1) Lloyd's<br>(2) SRI<br>(3) Kemper | $100 million in excess of $250 million |
| Sixth Layer | Chubb Atlantic Indemnity Ltd. | $50 million in excess of $350 million |

[Id., No. 2.]  Except as otherwise stated the respective

excess policies, these policies[3] were subject to the same

terms, exclusions, conditions and definitions as the CNA

Combined Aggregated Protection Policy No. RDX 189171788

("CNA Primary Policy").  [Id., No. 3.]


In August 1997, Anaconda Operations Pty. Ltd.

("Anaconda") entered into an Engineering, Procurement,

and Construction Contract and a Commissioning Assistance

and Ramp Up Agreement (collectively, "the Contracts")

with Fluor for the turn-key construction of the Murrin

Murrin Nickel and Cobalt Extraction Plant ("the Plant")

in Western Australia.  [Id., No. 12.]  In early 1999,

Anaconda began identifying numerous alleged deficiencies

in Fluor's engineering, procurement, design, and

---

[3] These policies include Allianz Combined Aggregated
Protection Policy No. AXL 5209101 ("Allianz Policy"),
Lloyd's Combined Aggregated Protection Policy No.
509/QF573298 ("Lloyd's Fifth Layer Policy"), SRI Combined
Aggregated Protection Policy No. 509/QF573298 ("SRI Fifth
Layer Policy"), and Kemper Combined Aggregated Protection
Policy No. 4LY 000248 ("Kemper Fifth Layer Policy").

construction of the Plant; thereafter, Anaconda ceased
making payments toward the Contracts, leaving a balance
of more than AUD $34 million on the price of the
Contracts, and also drew upon approximately AUD $45
million in security retention monies to rectify the
Plant's alleged deficiencies.  [Id., No. 13.]

On October 19, 1999, Anaconda presented a demand for
arbitration regarding its damages claims against Fluor
for the alleged deficiencies.  [Id.]  The arbitration
between Fluor and Anaconda proceeded in two phases.
[Id., No. 14.]  Phase I of the arbitration between Fluor
and Anaconda commenced on January 28, 2002, concluded on
May 29, 2002, and ultimately resulted in an award of
approximately AUD $150,000,000.  [Id., No. 15.]

Phase II of the arbitration hearing between Fluor and
Anaconda commenced on September 22, 2003.  [Id., No. 16.]
After lengthy negotiations, a settlement was reached
between Fluor and Anaconda, in which Fluor agreed to pay
Anaconda AUD $155,000,000 and Anaconda's bondholders US
$11,500,000.  [Id., No. 17.]  In return for Fluor's
payment of the settlement amount, Anaconda agreed to
assign to Fluor all of its rights, title, and interest in
potential claims against the Early Works Contractors who
worked on the Plan and may have been partially
responsible for the alleged defects in the Plant.  [Id.,

1 | No. 18.]  This settlement was executed by Fluor and
2 | Anaconda on May 5, 2004.  [Id., No. 19.]

3

4 | The Phase II settlement exhausted Fluor's Third Layer
5 | of excess insurance and also required Allianz, the Fourth
6 | Layer insurer, to pay the full extent of its policy
7 | limit, US $50,000,000 in excess of US $200,000,000.
8 | [Id., No. 20.]  In addition, the Fifth Layer Insurers
9 | paid approximately US $38,000,000 toward the Phase II
10 | settlement on or before May 21, 2004, as well as
11 | approximately US $3,000,000 to Fluor as reimbursement for
12 | Claims Expenses incurred in connection with the
13 | arbitration.  [Id., Nos. 21, 22.]

14

15 | As a result of the award issued in Phase I of the
16 | arbitration, the settlement reached by Fluor and Anaconda
17 | in Phase II of the arbitration, and the Claim Expenses
18 | incurred in both phases of the arbitration, Fluor's
19 | insurers paid approximately US $281,000,000 under their
20 | respective policies.[4]  [Id., No. 23.]

21

22 | [4] The $281 million figure does not include the $10
million self-insured retention paid by Fluor, and thus
23 | the Ultimate Net Loss was approximately $291 million.
This is consistent with the parties' stipulation that
24 | approximately $41 million was paid out under the Fifth
Layer policies, which provided coverage for $100 million
25 | in excess of $250 million.  [See St. of Facts Nos. 21,
22.]

26 | The Ultimate Net Loss is defined as "the total sum
27 | the INSURED or the Company or both become [sic] obligated
to pay as DAMAGES, CLAIM EXPENSES, or CLEANUP COSTS,
28 | (continued...)

Following the execution of the Phase II settlement agreement, Fluor commenced several legal proceedings in Australia against certain Early Work Contractors that are alleged to be partially responsible for the defects in the Plant ("the EWC proceedings").  [Id., No. 24.]  These proceedings remain ongoing in Australia.  [Id., No. 25.] To date, the EWC proceedings have resulted in subrogation recoveries of approximately AUD $36,000; however, the parties expect to recover additional amounts.  [Id., Nos. 28, 29.]

## IV.   DISCUSSION

As an initial matter, the Court notes that only Fluor, the Fourth Layer Insurer Allianz, and the Fifth Layer Insurers, are parties to this interpleader action; the other primary and excess insurers are not parties.

The Fifth Layer Insurers move for summary judgment on their claims for declaratory relief on the grounds that controlling policy language, applicable law, equitable considerations, and fundamental principles of excess insurance require that all subrogation recoveries by the insured, Fluor, be distributed among the primary and excess insurers on a "top-down" basis.  [Notice of Motion at 2.]  Under top-down recovery, higher layer excess

_____

[4] (...continued)
either through adjudication, compromise or agreement."
[Stipulated Facts No. 5.]

1  insurers are fully reimbursed before lower layer insurers
2  recover any portion of their loss payments.  Here then,
3  the Fifth Layer Insurers would be entitled to all
4  subrogation recoveries until they have been fully
5  reimbursed for the approximately $41 million loss payment
6  made under their policies.  [See Mot. at 9.]  Only then
7  would any remaining recovery amount go to Allianz, the
8  Fourth Layer Insurer, until it was fully reimbursed.
9
10      Allianz opposes summary judgment, arguing that the
11 controlling policy provisions require allocation of
12 recovery amounts on a pro-rata basis among all insurers.[5]
13 [Opp'n at 2.]  Under pro-rata distribution, each insurer
14 is entitled to a pro-rata share of the subrogation
15 recoveries corresponding to the proportion of the total
16 loss paid by that insurer, without regard to the layer of
17 insurance.
18
19 **A.   THE FIFTH LAYER POLICIES**
20      **1.   Subrogation and Recovery Provisions**
21      The Fifth Layer Insurers maintain that they are
22 contractually entitled to top-down recovery based on the
23 subrogation provisions in their policies.  [Mot. at 9-
24 10.]  The Lloyd's Fifth Layer Policy and the SRI Fifth
25 Layer Policy contain this identical provision:
26 _____
27      [5] Allianz also states that it is probably entitled to
   judgment as a matter of law, [Opp'n at 2]; however, it
28 has not moved for summary judgment.

1      6.   All recoveries or payments recovered
       subsequent to a loss settlement under this
2      Policy shall be applied as if recovered or
       received prior to such settlement and all
3      necessary adjustments shall then be made between
       the Assured and the Underwriters provided always
4      that nothing in this Policy shall be construed
       to mean that loss settlements under this Policy
5      are not payable until the Assured's ultimate net
       loss has finally been ascertained.
6

7   [St. of Facts No. 6.]   The precise meaning of this

8   provision is disputed by the parties.[6]

9

10      The Kemper Fifth Layer Policy employs different

11   language:   "Any amount recovered will be apportioned in

12   the inverse order of payment of loss to the extent of

13   _____

14      [6] The Fifth Layer Insurers maintain that under these
    provisions, "recoveries from third parties effectively
15   operate to reduce the insured's Ultimate Net Loss."
    [Mot. at 10.]
16
         If, for example, Fluor were [to] recover a
17      total of $10 million in the EWC Proceedings, the
       effect would be to reduce Fluor's Ultimate Net
18      Loss from [$291] million to [$281] million, thus
       reducing the Fifth Layer Insurers' obligation
19      from $41 million to $31 million.  Since the
       Fifth Layer Insurers already have paid the $41
20      million, the "necessary adjustments" required by
       Paragraph 6 would require that the $10 million
21      recovery inures entirely to the benefit of the
       Fifth Layer Insurers.
22
    [Id.; see supra note 4.]   Allianz disputes this
23   interpretation of the Lloyd's and the SRI policies,
    stating that "the cryptic term 'necessary adjustments'"
24   is not defined in the policies and its meaning is
    unclear.   [Opp'n at 4 n.3.]   Thus, "Allianz submits that
25   neither Lloyds [sic] nor SRI are entitled to summary
    judgment based on this ambiguous policy term."   [Id.]
26   The Court declines to resolve this issue; however, the
    Court does note that this provision is considerably more
27   ambiguous than the provision upheld and enforced in
    Century Indemnity Co. v. London Underwriters, 12 Cal.
28   App. 4th 1701 (1993).

1   actual payment.  The expenses of all such recovery

2   proceedings will be apportioned to the ratio of

3   respective recoveries."  [Stipulated Facts No. 13.]

4

5       **2.  "Follow Form" Provisions**

6       Allianz contends that the Fifth Layer policies'

7   subrogation and recovery provisions are irrelevant to

8   this dispute because of the following endorsement to the

9   Fifth Layer policies:

10          It is hereby understood and agreed that such
            insurance as is afforded by this policy is
11          following form and excess of Continental
            Casualty Company #RDX 1891788, hereinafter
12          called the "Underlying Policy".  This policy is
            warranted to the exact terms and conditions of
13          the Underlying Policy except with respect to the
            retroactive dates, limit of liability and
14          premium, and all preprinted terms and conditions
            herein are deleted to the extent they vary from
15          or are inconsistent with the terms and
            conditions of the Underlying Policy.[7]

16

17   [St. of Facts No. 9.]  Allianz argues that this

18   endorsement negates the Fifth Layer policies' subrogation

19   and recovery provisions because these provisions are

20   "inconsistent with", or at least "vary from", the

21   underlying CNA Primary Policy provision governing

22   subrogation and recovery.  [Opp'n at 12-13.]

23   ///

24   ///

25

26   ─────────────────

        [7] This is the language found in the Lloyd's Fifth
27   Layer Policy and the SRI Fifth Layer Policy.  Almost
     identical language is also found in the Kemper Fifth
28   Layer Policy.  [See St. of Facts No. 11.]

1    The Fifth Layer Insurers disagree and insist that the

2    "follow form" endorsement does not "operate to replace

3    the Fifth Layer Policies' top-down subrogation clauses

4    with the CNA Primary Policy's pro-rata clause" because

5    these subrogation provisions are consistent and

6    reconcilable.  [Reply at 4.]  The Fifth Layer Insurers,

7    however, fail to address why the "vary from" language in

8    the "follow form" endorsement is also inapplicable.[8]

9

10   The interpretation of an insurance policy is a

11   question of law that is subject to well-settled rules of

12   contract interpretation.  See E.M.M.I. Inc. v. Zurich Am.

13   Ins. Co., 32 Cal. 4th 465, 470 (2004).  Under these

14   principles, the contract must be interpreted to give

15   effect to the "mutual intention" of the parties, which is

16   to be inferred, if possible, solely from the written

17   provisions of the contract.  Id.  Generally, under

18   California law, "the 'clear and explicit' meaning of

19   these provisions, interpreted in their 'ordinary and

20   popular sense,' . . . controls judicial interpretation."

21   Id.  Furthermore, where a policy provision is ambiguous

22   (i.e., susceptible to two or more reasonable

23   constructions), the "ambiguous language is construed

24

25       [8] In the Motion, the Fifth Layer Insurers also argue
26   that the "follow form" endorsement only applies to
     "preprinted terms and conditions" and that the
27   subrogation clause in the Fifth Layer policies is not a
     preprinted term.  [Mot. at 14-15.]  This argument is
28   neither well-developed nor persuasive.

1  against the party who caused the uncertainty to exist."
2  Id.

3

4      As further explained below, the subrogation
5  provisions in the Fifth Layer policies and the CNA
6  Primary Policy are not necessarily inconsistent with each
7  other because the subrogation and recovery provisions in
8  the CNA Primary Policy and the Fifty Layer policies cover
9  different contingencies.  See infra Part IV.B.
10 Nevertheless, the "follow form" endorsements use broad
11 and forceful language to indicate that the excess
12 policies are "warranted to the *exact* terms and conditions
13 of the Underlying Policy . . . and all preprinted terms
14 and conditions here are *deleted* to the extent they *vary*
15 *from* or are inconsistent with the terms and conditions of
16 the Underlying Policy."  [St. of Facts No. 9 (emphasis
17 added).]  The subrogation and recovery provisions in the
18 Fifth Layer policies undoubtedly "vary from"--as
19 understood in its "ordinary and popular sense"--the
20 corresponding provisions in the CNA Primary Policy.[9]  In
21 other words, the subrogation provisions in the Fifth
22 Layer policies are different from those found in the CNA
23 Primary Policy.  In such instances, these provisions
24 ///

25

26     [9] At the very least, the phrase "vary from", as used
   in the Fifth Layer policies' endorsements, is ambiguous.
27 Thus, the provision must be construed against the Fifth
   Layer Insurers who inserted this language into the
28 policies.  See E.M.M.I. Inc., 32 Cal. 4th at 470.

1  effectively are "deleted", and the CNA Primary Policy's
2  subrogation and recovery provisions control.

3

4  **B.   THE CNA PRIMARY POLICY**

5      **1.   Allianz's Interpretation**

6      Allianz's claim to a portion of the recovery proceeds

7  (and its opposition to the top-down recovery sought by

8  the Fifth Layer Insurers) rests on its interpretation of

9  the "Subrogation or Recovery" provision in the CNA

10 Primary Policy (hereinafter "CNA recovery provision").

11 This provision states in part:

> 3.   Any recovery, including indemnification the
> INSURED collects from the United States
> Government or any state or foreign government or
> its agencies, for any ULTIMATE NET LOSS paid by
> the Company under this insurance shall be
> apportioned in the following order
>       a.   To the INSURED and/or Company for
>            amounts such party paid as expenses
>            necessary to the recovery;
>       b.   To the INSURED and Company in proportion
>            to the ULTIMATE NET LOSS amounts each
>            party paid within the applicable
>            Retention and Limit of Liability
>            respectively with respect to the CLAIM
>            until the Company has fully recovered
>            the ULTIMATE NET LOSS it paid under this
>            insurance or none of the recovery
>            remains, whichever comes first; and
>       c.   To the INSURED with respect to any
>            balance remaining.

23 [St. of Facts No. 8.]  According to Allianz, subparagraph

24 (b) requires that recovery amounts be apportioned on a

25 pro-rata basis, meaning "that all liability Insurers who

26 have made defense or indemnity payments to or on behalf

27 of Fluor, along with Fluor itself, will share in any

28

1  subsequent subrogation recovery based on how much each
2  party contributed to the total of all defense or
3  indemnity payments that were made."   [Opp'n at 4.]
4  Allianz calculates that it is entitled to recover more
5  than 17% of all subrogation recoveries under this pro-
6  rata approach.   [Id.]

7

8      Allianz's interpretation of the CNA recovery
9  provision is flawed.[10]   Nothing in subparagraph (b)
10  expressly indicates that it is meant to apply where the
11  Ultimate Net Loss is paid in part by an insured, a
12  primary insurer, and multiple layers of excess insurers.
13  Subparagraph (b) only contemplates the allocation of
14  funds between the Insured and the Company.   Thus, on its
15  face, this recovery provision only controls the
16  distribution of recovery proceeds between Fluor and CNA.

17

18      Even assuming, as Allianz does, that the CNA recovery
19  provision can reasonably be extrapolated to control the
20  allocation of recovery proceeds between primary and
21  excess insurers, another problem remains.   Allianz's

22

23      _____
24      [10] Allianz devotes only one paragraph of its
       Opposition to this issue and provides virtually no
       analysis of why its interpretation is the correct
25      construction of this provision.   [See Opp'n at 4.]
       Instead, it asserts that "the Fifth Layer Insurers agree
26      with Allianz that this policy provision requires that
       subrogation recoveries be distributed on a pro rata
27      basis."   The Fifth Layer Insurers do not affirmatively
       adopt or challenge Allianz's interpretation of this
28      provision.

interpretation of this provision presumes that the excess
insurers should be bundled as part of "the Company".
Nevertheless, the more logical interpretation is to treat
the excess insurers as part of "the Insured", given that
the excess insurance policies indemnify "the Insured" for
the Ultimate Net Loss *in excess* of the CNA Primary
Policy, amounts that would otherwise be paid by "the
Insured".

This point is clarified by considering a variation of
the hypothetical set forth in <u>Century Indemnity Co.</u>  <u>See</u>
12 Cal. App. 4th at 1709-10.  Consider what would have
occurred under the CNA recovery provision if Fluor did
not have any excess coverage and it paid the Ultimate Net
Loss in excess of the CNA Primary Policy with its own
assets.  Assume, as in this case, CNA paid the entire
policy limit "within the applicable Retention and Limit
of Liability respectively."[11]  Under subparagraph (b), all

---

[11] This assumption is supported by the facts of this
case and also is justified because the "in proportion to"
language in subparagraph (b) only applies to the
"ULTIMATE NET LOSS amounts each party [i.e., the Insured
and the Company,] paid *within the applicable Retention
and Limit of Liability respectively* with respect to the
CLAIM."  [<u>See</u> St. of Facts No. 8 (emphasis added).]
Thus, the excess insurers (to the extent that they are
part of "the Insured") would only be entitled to a pro-
rata recovery for the Ultimate Net Loss amounts they paid
within the Retention and Limit of Liability of the CNA
Primary Policy--i.e., nothing.  By definition, the excess
insurance policies only pay for amounts beyond, not
within, the limit of liability of the primary policy.

The term "the Insured", as used in subparagraph (b),
(continued...)

16

1  of the recovery proceeds would have gone to CNA until it

2  fully recovered the Ultimate Net Loss paid under the

3  policy, and only then would Fluor be entitled to any

4  remaining balance under subparagraph (c).  Thus, if one

5  were to analogize to this case, Fluor's excess insurance

6  covered the portion of the Ultimate Net Loss attributable

7  to subparagraph (c).

8

9      If the CNA recovery provision is to be extrapolated

10 to cover the allocation of recovery proceeds between both

11 CNA, the primary insurer, and multiple excess insurers,

12 the most logical extrapolation would be to interpret

13 subparagraph (b) to favor CNA (i.e., "the Company") at

14 the expense of all excess insurers, including Allianz and

15 the Fifth Layer Insurers, who would be entitled to

16 recovery under subparagraph (c).  In other words, CNA,

17 which is not a party to this action, would presumably be

18 entitled to the first $15 million of any subrogation

19 recovery under this interpretation.

20 _____

21    [11](...continued)
   thus could only be Fluor in this case; however, as
22 discussed above Fluor did not pay any amounts toward the
   Ultimate Net Loss "within the applicable Retention and
23 Limit of Liability respectively" since CNA paid the
   entire amount, i.e., 100% of the policy limit.
24
       This complex and somewhat unwieldy organization of
25 subparagraph (b) may anticipate the circumstances where
   CNA might pay less than 100% (and the Insured would pay a
26 proportion) of the Ultimate Net Loss within the
   applicable Retention and the aggregate Limit of Liability
27 because of the CNA Primary Policy's "occurrence"-based
   limits on a claim.  [See Declaration of William J. Casey
28 in Support of Motion, Ex. 2 at 10.]

1    For this reason, a key assumption in Allianz's
2    argument fails.   The CNA recovery provision does not
3    apportion the recovery on a pro-rata basis based on the
4    contribution of each of the liability Insurers, as well
5    as Fluor, towards the Ultimate Net Loss.   Instead, if it
6    is to be given any meaning in this case, the provision
7    favors CNA, the party that drafted it, and brings it to
8    the front of the reimbursement line.   Thus, Allianz is
9    not entitled to a pro-rata share of approximately 17% of
10   any subrogation recovery.

11

12        **2.   An Alternative Interpretation**

13   The most reasonable construction of the CNA recovery
14   provision, however, is simply to construe each of the
15   Fifth Layer policies to include the CNA recovery
16   provision.   This approach is consistent with how a
17   "follow form" endorsement typically applies to other
18   types of provisions.   For example, if the underlying
19   policy included a narrower exclusion for advertising
20   injury than the excess policy, then, pursuant to the
21   "follow form" provision, the narrower exclusion would
22   replace the broader one in the excess policy.   Cf.
23   Housing Group v. Cal. Ins. Guarantee Ass'n, 47 Cal. App.
24   4th 528, 530-31 (1996)(stating that a "broad as primary"
25   provision, which is similar to a "follow form" provision,
26   of an umbrella excess policy precluded enforcement of an
27   exclusion not present in the underlying policy).

28

1  Under this approach, the excess insurance policies
2  with a "follow form" endorsement would be deemed to
3  include the identical CNA recovery provision.  This,
4  however, does not resolve completely the issue in this
5  case because the CNA recovery provision is silent on the
6  crucial point of how subrogation recovery proceeds are to
7  be allocated between multiple insurers.  Such an
8  interpretation could mean then that recovery provisions
9  in the insurance policies would all conflict with each
10  other, with each insurer insisting that it held priority
11  under its own policy just as CNA had priority under the
12  other interpretation discussed above.

13

14  Thus, the interplay of the CNA recovery provision and
15  the various "follow form" endorsements does not resolve
16  the key issue of how recovery proceeds should be
17  distributed between multiple layers of insurers.  Neither
18  of these two interpretations of the CNA recovery
19  provision resolves the dispute in this case; therefore,
20  the Court must look outside the policies to resolve this
21  issue.

22

23  **C.   EQUITABLE CONSIDERATIONS**

24  When the insurance contract is silent on an issue,
25  California law permits consideration of equitable
26  principles.  <u>See, e.g., Signal Companies, Inc. v. Harbor</u>
27  <u>Ins. Co.</u>, 27 Cal. 3d 359, 369 (1980); <u>Scottsdale Ins. Co.</u>

28

1  v. State Farm Mut. Auto. Ins. Co., 130 Cal. App. 4th 890,

2  904 (June 28, 2005).  In particular, equitable principles

3  are important where the relative obligations of multiple

4  insurers are at issue:

> 5  The reciprocal rights and duties of several
> insurers who have covered the same event do not
> 6  arise out of contract, for their agreements are
> not with each other. . . .  Their respective
> 7  obligations flow from equitable principles
> designed to accomplish ultimate justice in the
> 8  bearing of a specific burden.  As these
> principles do not stem from agreement between
> 9  the insurers their application is not controlled
> by the language of their contracts with the
> 10  respective policy holders.

11  Id. (quoting Am. Auto. Ins. Co. v. Seaboard Surety Co.,

12  155 Cal. App. 2d 192, 195-196 (1957)).

13

14      Here, the equitable considerations unequivocally

15  favor the Fifth Layer Insurers.  Their excess insurance

16  policies explicitly state that coverage is not triggered

17  until exhaustion of all underlying policies.  [See St. of

18  Facts Nos. 4, 5.]  In other words, the Fifth Layer

19  Insurers' policies are not triggered until Allianz pays

20  the limit of its liability.  A pro-rata distribution of

21  recovery amounts would undermine the system of layered

22  excess insurance by effectively imposing a duty of

23  indemnification on higher-layer insurers before the

24  underlying policies are exhausted and alter the

25  ///

26  ///

27  ///

28

1  bargained-for distribution of risk between the layers of

2  insurance.[12]

3

4      At least one California Court of Appeal has indicated

5  that top-down recovery is the most equitable method of

6  allocating recovery proceeds where there are multiple

7  layers of insurance.  In <u>Century Indemnity Co.</u>, the court

8  concluded that the excess carrier was entitled to full

9  reimbursement before the primary insurer was entitled to

10 any recover subrogation proceeds.  12 Cal. App. 4th at

11 1710.  Although this case was decided based on the

12 provisions of the insurance contracts, both the trial

13 court and the appellate court indicated that equitable

14 principles supported the same result.  <u>See</u> <u>id.</u> (citing a

15 California insurance treatise on this point).

16

17                    **V.   CONCLUSION**

18     For the foregoing reasons, the Fifth Layer Insurers'

19 Motion for Summary Judgment is GRANTED IN PART.  The

20 Fifth Layer Insurers are entitled to all subrogation

21 _____

22     [12] Furthermore, the pro-rata distribution system is
   arbitrary in that the amount of loss paid by each of the

23 different insurers depends on when the subrogation
   recovery proceeds are received.  For example, imagine if

24 some of the Early Work Contractors settled with Anaconda
   before the Phase II settlement and thereby reduced

25 Anaconda's damages, Fluor's liability, and the Ultimate
   Net Loss under the CAP Insurance Program.  The recovery

26 proceeds would have reduced only the Fifth Layer
   Insurers' losses because the proceeds would have reduced

27 the Ultimate Net Loss.  In contrast, payments made after
   the Phase II settlement would be allocated on a pro-rata

28 basis among all insurers who made loss payments.

1  recoveries by Fluor on a top-down basis *with respect to*
2  *the parties before the Court.*  Thus, the Fifth Layer
3  Insurers must be reimbursed fully before Allianz is
4  entitled to recover any remaining balance.
5
6  **IT IS SO ORDERED.**
7
8  Dated: August 16 2005

   VIRGINIA A. PHILLIPS
9                                  United States District Judge
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28